UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RUTH E. RICHARDS,<br><br>Plaintiff,<br><br>v.<br><br>METROPOLITAN POLICE DEPARTMENT OFFICER JENNIFER GELSOMINO,<br><br>Defendant. | Civil Action No. 16-1002 (JDB) |

# MEMORANDUM OPINION

On May 29, 2013, plaintiff Ruth Richards was arrested following her involvement in a domestic dispute with her ex-husband and his girlfriend. She brought this action pursuant to 42 U.S.C. § 1983 against the arresting officer, defendant Jennifer Gelsomino, alleging that Gelsomino arrested her without probable cause and because of her race and national origin in violation of her Fourth and Fifth Amendment rights. Gelsomino has moved for summary judgment, which Richards opposes. See Def.'s Mot. for Summ. J. ("Def.'s Mot.") [ECF No. 37]; Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n") [ECF No. 39]. For the reasons explained below, the Court will grant Gelsomino's motion.

## BACKGROUND

### I. FACTS

The facts of this case are largely undisputed. Richards' description of the domestic dispute has not been challenged by the defendant and both parties agree on the facts pertinent to Gelsomino's investigation of the incident and Richards' Fourth Amendment claim. Disputes

between the parties as to facts relevant to Richards' Fifth Amendment claim are noted where applicable.

### A. The Domestic Dispute

Richards has known her now-ex-husband, George Richards,[1] since she was 13 years old, when they both lived on the same street in Jamaica. Pl.'s Objs. & Resps. to Def.'s 1st Set of Interrogs. ("Pl.'s Objs. & Resps."), Ex. A. to Pl.'s Opp'n [ECF No. 39-3] at 6. The two eventually married and moved to Washington, D.C. At some point, their marriage dissolved, ending in divorce. It is not clear from the record whether their divorce was acrimonious. However, it apparently became so the first time Richards encountered George with his new, younger girlfriend, Sharneisha Grady.

Richards often visited Grady's neighborhood because she had friends who lived nearby, including Richards' former mother-in-law, Eva Woods, who lived next-door to Grady. See id. at 5; District of Columbia Office of Police Complaints ("OPC") Report of Investigation ("OPC Report"), Ex. D to Pl.'s Opp'n [ECF No. 39-6] at 19. But until the dispute that led to this lawsuit, Richards and Grady had never met. See Pl.'s Objs. & Resps. at 6.

That changed on May 29, 2013. Richards, who had visited a friend in the area, was walking down Woods' street when George pulled his car up in front of Grady's house. Id. George got out of his car—as did Grady and her young son. Id. Richards walked up to George and Grady and asked, sarcastically, "Is that your daughter?" Id.

George slapped Richards across the face. Id. Richards began yelling in response, swinging her handbag at George. Richards Dep., Ex. B. to Pl.'s Opp'n [39-4] at 24:1–8; Pl.'s Objs. & Resps. at 6. The commotion was loud enough to attract the attention of neighbors down the street. See

---

[1] Hereinafter referred to as "George" for the sake of clarity.

OPC Report at 27. It is unclear how long the shouting lasted, but the parties eventually dispersed, and Richards retreated to Woods' house, while George, Grady, and her child went next door to Grady's house. Pl.'s Objs. & Resps. at 6.

### B. Richards' Arrest

Shortly after the altercation, both Grady and her son called 911 to report the dispute. Grady requested police assistance, stating that Richards was outside her home talking loudly and making threats. Sharneisha Grady 911 Call, Ex. 3 to Def.'s Mot. (on file) at 0:53–2:10. Grady's son also called 911, stating that Richards was "talking crap to [his] mom" and had threatened to call the police on them. D. Grady 911 Call, Ex. 4 to Def.'s Mot. (on file) at 0:35–1:24. The dispatch team broadcasted to Metropolitan Department Police ("MPD") officers that a woman matching Richards' description had threatened bodily harm at Grady's address, and that Richards was believed to be at the scene. Radio Run, Ex. 5 to Def.'s Mot. (on file) at 1:46–2:20.

Gelsomino and her partner, Officer Nelson Alas, responded to the dispatch request. After arriving at the scene, the officers split up. Alas went to Woods' house to speak with Richards, while Gelsomino went to Grady's house. Pl.'s Objs. & Resps. at 7; Gelsomino Dep. Ex. 2 to Def.'s Mot. [ECF No. 37-3] at 72:4–12. Grady told Gelsomino that Richards had "got in [her] face" and said, "bitch, I'm going to smack you." Def.'s Stmt. of Undisputed Material Facts ("Def.'s Stmt."), Ex. 1 to Def.'s Mot. [ECF No. 37-1] ¶¶ 10–11; Pl.'s Stmt. of Material Facts for Which There Is a Genuine Dispute ("Pl.'s Stmt."), Ex. 1 to Pl.'s Opp'n [ECF No. 39-1] ¶¶ 10–11.[2] She also said that she believed that Richards was going to hurt her and was capable of carrying out the threat. Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 12. George corroborated Grady's statement, telling Gelsomino that

---

[2] Although Richards denies that she in fact threatened Grady, she does not dispute that Grady reported the alleged threat to Gelsomino. Pl.'s Stmt. ¶ 11.

3

Richards had approached Grady very aggressively and had "threatened to assault her." Def.'s Stmt. ¶ 13; Pl.'s Stmt. ¶ 13.

After speaking with Grady and George, Gelsomino went next door to Woods' house and signaled to Richards to come down from the porch. Def.'s Stmt. ¶ 14; Pl.'s Stmt. ¶ 14. Gelsomino, who is white, then asked Richards, who is black, where she was born. Pl.'s Objs. & Resps. at 5, 7; Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15. Although the parties dispute how many times Gelsomino asked the question—Gelsomino says she asked it once, while Richards alleges she asked it twice—there is no dispute that it was the only question Gelsomino asked. See Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15. Richards, who speaks with an accent, told Gelsomino that she was from Jamaica. OPC Findings of Fact & Merits Determination ("OPC Findings"), Ex. E to Pl.'s Opp'n [ECF No. 39-7] at 6; Def.'s Stmt. ¶ 16; Pl.'s Stmt. ¶ 16.

At that point, Gelsomino arrested Richards and placed her in handcuffs. Def.'s Stmt. ¶ 17; Pl.'s Stmt. ¶ 17. Richards alleges that she asked Gelsomino to interview neighbors down the street who had seen the dispute, but Gelsomino allegedly responded that she wasn't "going down there." Pl.'s Objs. & Resps. at 8. Gelsomino did not question Richards about the alleged threats, nor did she provide Richards with a reason for the arrest. Grady Dep., Ex. C to Pl.'s Opp'n [ECF No. 39-5] at 111:13–18; Pl.'s Objs. & Resps. at 7.

After Richards was arrested, one of Woods' neighbors, Katherlean Johnson, approached the officers. OPC Report at 28. Johnson told Gelsomino and Alas that she had witnessed the dispute and had seen George hit Richards across the face. See id. Alas then arrested George as well. Id.; see George Richards Arrest Report, Ex. 7 to Def.'s Mot. [ECF No. 37-5] at 1–2.

Gelsomino brought Richards to the police station, while Alas took George. Pl.'s Objs. & Resps. at 8. Gelsomino asserts that while in the car, she asked Richards for basic biographical

information, including her date of birth, social security number, and birth place, in order to fill out a required booking form. See Def.'s Stmt. ¶¶ 18–21. Richards disputes this, arguing that there is no evidence that the booking form was ever filled out and notes that her place of birth was not included on her arrest form. Pl.'s Stmt. ¶ 18.

Gelsomino charged Richards with violating D.C. Code § 22-407, which prohibits threats to commit bodily harm. See Ruth Richards Arrest Report, Ex. 6 to Def.'s Mot. [ECF No. 37-4] at 1. Richards was held overnight in jail and was released the following day. Pl.'s Objs. & Resps. at 9–10. She never appeared before a judge and ultimately was not prosecuted. See id. at 10.

## II. Procedural History[3]

In 2016, Richards filed a civil complaint against Gelsomino in her individual capacity pursuant to 42 U.S.C. § 1983, alleging that Gelsomino had falsely arrested her without probable cause in violation of the Fourth Amendment and discriminated against her on the basis of her race and national origin in violation of the equal protection guarantee of the Fifth Amendment.[4] See Compl. [ECF No. 1] ¶¶ 14, 47–73. The parties completed discovery, and Gelsomino moved for summary judgment. Gelsomino asserts that her conduct did not violate Richards' Fourth and Fifth Amendment rights and that, even if it did, Gelsomino is entitled to qualified immunity because she reasonably concluded that her conduct was lawful. Def.'s Mot. at 4, 11, 17. Richards opposes the

---

[3] Prior to filing the complaint in this Court, Richards filed a formal complaint with the D.C. Office of Police Complaints, alleging that Gelsomino harassed her by arresting her and discriminated against her by inquiring about her place of birth. See OPC Findings at 1. OPC concluded that D.C. law prohibited Gelsomino from making a warrantless arrest under the circumstances presented and that, by asking Richards where she was born, Gelsomino violated MPD guidelines and municipal regulations. Id. at 4–7 (citing D.C. Code § 23-581 and § 16-1031(a)). Gelsomino was subsequently disciplined. Letter of Prejudice, Ex. F to Pl.'s Opp'n [ECF No. 39-8]. As discussed below, although plaintiff cites the OPC Findings and Report, see Pl.'s Opp'n at 6–8, whether Gelsomino violated D.C. law or police procedures is a distinct question from the constitutional inquiry in this case. Further, the Court is required to conduct its own analysis and may not rely on the legal conclusions of OPC.

[4] The Fifth Amendment is applicable to the District of Columbia and includes the same equal protection guarantee found in the Fourteenth Amendment. Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

5

motion, arguing that Gelsomino's violations of Richards' Fourth and Fifth Amendment rights are clear and that, at the time of her conduct, it was clearly established that Gelsomino's actions violated the Constitution. Pl.'s Opp'n at 11–23. The motion is fully briefed and ripe for resolution.

## LEGAL STANDARD

Summary judgment is warranted if the moving party "shows that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "In determining whether a genuine issue of material fact exists, the court must view all facts, and draw all reasonable inferences, in the light most favorable to the party opposing the motion." Lane v. District of Columbia, 887 F.3d 480, 487 (D.C. Cir. 2018) (citation omitted). However, if the movant shows that "there is an absence of evidence to support the nonmoving party's case," judgment should be entered in the movant's favor. Durant v. D.C. Gov't, 875 F.3d 685, 696 (D.C. Cir. 2017), cert. denied sub nom. Durant v. District of Columbia, 138 S. Ct. 2608 (2018) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

## ANALYSIS

Richards brings her claims pursuant to 42 U.S.C. § 1983, which provides a cause of action against any state actor who causes the plaintiff to be deprived "of any rights, privileges, or immunities secured by the Constitution and laws." Although a government official may be held individually liable for conduct that violates constitutional rights, that liability is limited by the doctrine of qualified immunity. See District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018).

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Id. (citation omitted). For the unlawfulness of the conduct to have been "clearly established," it must have been sufficiently clear at the time of the officer's actions that "every reasonable official would understand that what [s]he is doing is unlawful." Id. (citation and internal quotation marks omitted). The plaintiff bears the burden of establishing that the purported right "'was clearly established' for qualified-immunity purposes." Daugherty v. Sheer, 891 F.3d 386, 390 (D.C. Cir. 2018) (citation omitted).

It is within the Court's discretion to decide which qualified immunity prong to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). However, "there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established 'prong.'" Id. This is such an instance. Because the Court's conclusion regarding the merits of the constitutional claim also satisfies the question of qualified immunity, the Court need only address whether Gelsomino's conduct violated Richards' Fourth and Fifth Amendment rights.

I. **COUNT I: FOURTH AMENDMENT CLAIM**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure is "reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). The determination of whether an officer had probable cause to arrest an individual involves a mixed question of law and fact and hence should ordinarily be left to the jury. Amobi

7

v. D.C. Dep't of Corrections, 755 F.3d 980, 990 (D.D.C. 2014). "Only where the facts are undisputed or clearly established does probable cause become a question of law for the court." Id.

Here, the parties agree on the facts pertinent to Richards' Fourth Amendment claim. See Def.'s Stmt. ¶¶ 1–17; Pl.'s Stmt. ¶¶ 1–17. The crux of the parties' dispute instead rests on whether Gelsomino's investigation was sufficient under the law to permit her to have probable cause to believe that Richards committed a crime. See Pl.'s Opp'n at 11–16. Whether Gelsomino had probable cause to arrest Richards is therefore a question of law that the Court must decide.

To have probable cause to make an arrest, an officer must have had sufficient "information to 'warrant a man of reasonable caution in the belief' that a crime has been committed and that the person arrested has committed it." Barham v. Ramsey, 434 F.3d 565, 572 (D.C. Cir. 2006) (citation omitted). Probable cause entails "only a probability or substantial chance of criminal activity, not an actual showing of such activity." Wesby, 138 S. Ct. at 586 (citation omitted). Whether an officer had sufficient information to establish probable cause depends on the facts of each case and the totality of the circumstances. Id. at 588. Courts therefore must consider "the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Id. (internal quotation marks and citation omitted). At bottom, the relevant inquiry is whether the information known to the arresting officer at the time justified the arrest. Devenpeck, 543 U.S. at 152.

Gelsomino argues that she had probable cause to arrest Richards for threatening to do bodily harm in violation of D.C. Code § 22-407.[5] To arrest Richards for violating § 22-407, there

---

[5] The Court may consider whether Gelsomino had probable cause to believe Richards had committed any criminal offense, even one not charged by the officer. See Devenpeck, 543 U.S. at 153 (an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause"). Gelsomino argues that she also had probable cause to arrest Richards for simple assault (D.C. Code § 22-404) and conduct that constituted "an intrafamily offense that caused or was intended to cause reasonable fear of imminent serious physical injury or death" (D.C. Code § 16-1031(a)(2)). Def.'s Mot. at 8–10. However, because the Court finds that Gelsomino had probable cause to believe that Richards committed the charged violation of D.C. Code § 22-

8

must have been sufficient evidence for Gelsomino to believe that it was probable that Richards "uttered words" to Grady that "were of such a nature to cause the ordinary hearer reasonably to believe that the threatened harm would take place," and that Richards "intended to utter the words as a threat." Lewis v. United States, 138 A.3d 1188, 1191 (D.C. 2016) (citation and emphasis omitted). Gelsomino need not have heard the threat herself.[6] It is sufficient that she "received . . . information from some person—normally the putative victim or an eyewitness—who it seems reasonable to believe is telling the truth." Daniels v. United States, 393 F.2d 359, 361 (D.C. Cir. 1968). When the person reporting the crime is the purported victim, probable cause is established so long as the victim "communicates to the arresting officer information affording credible ground for believing that the offense was committed and . . . unequivocally identifies the accused as the perpetrator, and . . . materially impeaching circumstances are lacking." Pendergrast v. United States, 416 F.2d 776, 785 (D.C. Cir. 1969).

Here, Grady provided Gelsomino with a "credible ground" to believe she had been threatened and that Richards was the perpetrator. Grady told Gelsomino that Richards, whom she identified as her boyfriend's ex-wife, had "got in her face" and threatened to "smack" her. Def.'s Stmt. ¶¶ 10–11; Pl.'s Stmt. ¶¶ 10–11. She further stated that she believed Richards could and would carry out that threat. Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 12. If Grady's statements were true,

---

407, the Court need not consider whether Gelsomino also had probable cause to arrest Richards for other, uncharged offenses.

[6] In her reply, defendant raises an additional issue: whether the Fourth Amendment permits warrantless arrests for misdemeanor crimes only when such crimes have been committed in the officer's presence. Def.'s Reply Papers ("Def.'s Reply") [ECF No. 41] at 8. Both the Supreme Court and the D.C. Circuit have left this an open question. See Atwater v. City of Lago Vista, 532 U.S. 318, 340 n.11 (2001) ("We need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests."); Scott v. District of Columbia, 101 F.3d 748, 754 (D.C. Cir. 1996) (noting that "[t]he Fourth, Fifth, and Ninth Circuits have held that the Fourth Amendment does not incorporate the common-law presence requirement for misdemeanor arrests" and stating that the court "need not decide this issue"). Hence, even if such arrests are constitutionally prohibited, it would not have been clear to Gelsomino that it was unconstitutional to make a warrantless arrest for a misdemeanor offense committed outside of her presence. Gelsomino would therefore be entitled to qualified immunity and Richards' Fourth Amendment claim would still fail.

Richards' alleged conduct would have constituted a threat to do bodily harm. See Lewis, 138 A.3d. at 1191, 1194 (affirming threats conviction where victim reported that defendant stated to her that he would "smack the s*** out of [her]" and "get her f***ed up"); Jones v. United States, 124 A.3d 127, 131 (D.C. 2015) (affirming threats conviction where victim and defendant had a "tumultuous and emotionally charged" relationship and victim alleged that defendant "startled" him by stating he would "smack the shit out of" the victim).

There were no obvious "materially impeaching circumstances" sufficient to cause Gelsomino to doubt Grady's credibility. There was no apparent "reason to believe [Grady] was lying or providing [Gelsomino] with false information as to . . . who had been the aggressor." Garay v. Liriano, 943 F. Supp. 2d 1, 19 (D.D.C. 2013). Grady's statement regarding the threats was consistent with the information that dispatch provided Gelsomino and was corroborated by an eyewitness, George, who also said that Richards had approached Grady aggressively and had threatened her. Def.'s Stmt. ¶¶ 7, 13; Pl.'s Stmt. ¶¶ 7, 13. Moreover, Grady had reported the incident to 911 shortly after the domestic dispute occurred. At the time Gelsomino arrived, Richards remained next-door, close enough to have been able to carry out the threat. See Def.'s Stmt. ¶¶ 2–3, 8, 14; Pl.'s Stmt. ¶¶ 2–3, 8, 14. And, as discussed below, even after it came to light that George had hit Richards, Gelsomino may have reasonably concluded that Richards had threatened Grady and been the first aggressor.

But, Richards argues, "materially impeaching circumstances" were, in fact, present and would have come to light had Gelsomino conducted a more fulsome investigation. Had Gelsomino questioned Richards or told her why she was being arrested, Gelsomino would have learned that Richards denied threatening Grady. Pl.'s Opp'n at 14. Other witnesses might have affirmed that Richards had not made threats, but Gelsomino refused to speak with them. Id. at 15. Moreover,

had Gelsomino interviewed Grady's son, he might have revealed a motive for Grady to make false accusations: Richards had threatened to call 911 and report George and Grady. Id. at 14. Grady's credibility was further eroded, Richards argues, when Gelsomino learned that George had hit Richards, a fact Grady had failed to disclose in either her 911 call or conversation with Gelsomino. Because Gelsomino did not conduct a reasonable investigation, Richards asserts, Gelsomino was not aware of these "impeaching circumstances" and hence did not have sufficient information to establish probable cause to believe Richards had in fact threatened Grady. See id. at 15 & n. 7.

Although Richards is correct that an officer must investigate sufficiently such that she has "enough information" to warrant the belief that a crime has been committed, Barham, 434 F.3d at 572, Richards misapprehends the scope of what is constitutionally required before an officer may make a warrantless arrest. Law enforcement officers have a duty to investigate when it is unclear whether a crime has taken place. BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) (holding that officer had failed to investigate and establish an essential element of the charged crime prior to arrest and therefore lacked probable cause). But "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Amobi, 755 F.3d at 990 (citation omitted).

The statements provided by Grady and George were sufficient to establish probable cause and hence the Constitution did not require Gelsomino to question Richards or canvass the street for other eyewitnesses. See Williams v. District of Columbia, 268 F. Supp. 3d 178, 187 (D.D.C. 2017) ("[O]nce the Officers had probable cause to arrest [the defendant] for assault, they were not required by the Fourth Amendment to interview him to investigate his possible innocence before making an arrest."); Black v. District of Columbia, 480 F. Supp. 2d 136, 139 (D.D.C. 2007) ("[T]he law is clear that a failure to investigate a suspect's alibi does not negate probable cause."). Nor

was Gelsomino required by the Fourth Amendment to inform Richards of the reason for her arrest. Devenpeck, 543 U.S. at 155 ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required.") And given Grady's son's status as a minor child, Gelsomino's decision not to question him—and perhaps scare or psychologically harm him in the process—was also reasonable in light of the evidence already available to her.

Even if Gelsomino had conducted further investigation, nothing in the record indicates that she would have uncovered plainly exculpatory information sufficient to negate probable cause to believe Richards had threatened Grady. True, evidence that exculpates the suspect or negates an essential element of the alleged crime dispels any prior finding of probable cause. See, e.g., Corrigan v. District of Columbia, 841 F.3d 1022, 1031 (D.C. Cir. 2016) (finding any probable cause officers had to conduct a warrantless search of a home based on exigent circumstances was abated after an initial "sweep" revealed that no person or dangerous property was inside). But no such evidence has been presented here.

Instead, the additional evidence available to Gelsomino was either consistent with or would not bear on her conclusion that she had probable cause to arrest Richards. Any denials of guilt by Richards would not exculpate her. See Panetta v. Crowley, 460 F.3d 388, 396 (2d Cir. 2006) ("Although a better procedure may [be] for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him." (citation omitted)). And the evidence that did come to light or could have come to light through further investigation was consistent with a reasonable belief that Richards had committed a crime. Even if Gelsomino had interviewed Grady's son and he had told her that Richards had threatened to call the police and that Richards was "talking crap" to his mom, his

12

statements would tend to corroborate Grady's allegation against Richards. See Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 5. Similarly, Johnson's statement that she had not heard Richards threaten Grady is not inconsistent with Grady's allegations. Johnson admitted that she couldn't hear what the parties were saying, and that she had been across the street when the dispute occurred. OPC Report at 27; see Jones, 124 A.3d at 128–29 (noting that lower court found that testimony from a witness who claimed she did not hear any threat was "not actually inconsistent" where threat was made in a normal tone of voice prior to when witness began paying attention to the altercation). The fact that George hit Richards also does not contradict Grady's allegations or prevent the reasonable conclusion that both parties had committed crimes, even if Grady's description of the dispute was incomplete. See Frazier v. Williams, 620 F. Supp. 2d 103, 108 (D.D.C. 2009) ("[T]o the extent that the officers encountered two people who each appeared credible and who each claimed to be the victim of assault by the other, the police had probable cause to arrest either . . . or both." (citation omitted)).

Richards also relies on evidence that Gelsomino failed to adhere to professional standards regarding proper police protocol in investigations, including the proffered expert opinion of Dr. William T. Gaut.[7] See Decl. of William T. Gaut ("Gaut Decl."), Ex. G to Pl.'s Opp'n [ECF No. 39-9]; Pl.'s Opp'n 9–10, 15–16. However, although professional police standards may require police officers to undertake additional investigatory steps as good practice, as described above, the Fourth Amendment does not. "Moreover," as the Supreme Court has noted, "police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from

---

[7] The parties dispute the admissibility of Gaut's purported expert report, which opines on whether Gelsomino violated MPD's police procedures in her investigation of the alleged incident. In her reply, Gelsomino argues that Gaut's testimony is inadmissible because it constitutes legal conclusions and impermissible opinion testimony about the credibility of parties and witnesses. Def.'s Reply at 8–9. As Richards notes, Gelsomino did not challenge Gaut's declaration prior to her reply. However, the Court finds no need to rely on, and hence no need to address the admissibility of, Gaut's testimony.

time to time. [The Court] cannot accept that the search and seizure protections of the Fourth Amendment are so variable." Whren v. United States, 517 U.S. 806, 815 (1996).[8]

Finally, even if Gelsomino's arrest of Richards was motivated by racial or ethnic animus, such discrimination would not negate the existence of probable cause to make the arrest. See id. at 814. The Supreme Court has held that an officer's subjective reason for making an arrest is not relevant to a court's analysis of whether the arrest violated the Fourth Amendment. "[A]s long as the circumstances, viewed objectively, justify" the warrantless arrest, the requirements of the Fourth Amendment are satisfied. Devenpeck, 543 U.S. at 153. An officer's alleged discriminatory motive for making an otherwise constitutional arrest is best addressed via an equal protection violation claim, see Whren, 517 U.S. at 814, and accordingly will be considered through that lens here.

Because the undisputed facts demonstrate that there was probable cause to believe that Richards threatened to do bodily harm to Grady in violation of D.C. Code § 22-407, the Court concludes that Gelsomino's arrest of Richards did not violate the Fourth Amendment. Accordingly, the Court will grant summary judgment in favor of Gelsomino as to Count I.

## II.  COUNT II: FIFTH AMENDMENT

The Court also finds that summary judgment is warranted as to Richards' Fifth Amendment claim. The Fifth Amendment prohibits federal and D.C. government officials "from invidiously

---

[8] Under D.C. law, Gelsomino was only permitted to make a warrantless arrest for intrafamly threats made outside her presence if they "caused or [were] intended to cause reasonable fear of imminent serious physical injury or death." D.C. Code § 16-1031(a)(2). Richards seeks to rely on OPC's conclusion that, while Richards' alleged statements that she would "smack" Grady "in and of themselves might be classified as threats," Gelsomino did not have probable cause to believe that the threats "caused or [were] intended to cause reasonable fear of imminent serious physical injury or death" in violation of D.C. Code § 16-1031(a)(2) and, hence, Gelsomino subjected Richards to harassment by arresting her. OPC Findings at 4–5. But Richards has not alleged a violation of D.C. law. And, as discussed, it has not been established that the Constitution forbids a warrantless arrest for a misdemeanor crime committed outside the presence of an officer. See supra note 6. OPC's finding of harassment therefore does not bear on the Court's constitutional analysis.

discriminating between individuals or groups." Washington v. Davis, 426 U.S. 229, 239 (1976). It implicitly includes the same equal protection requirements that the Fourteenth Amendment imposes on the states, Bolling, 347 U.S. at 499, including the "direction that all persons similarly situated should be treated alike," City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). This constitutional guarantee of equal protection "prohibits selective enforcement of the law based on considerations such as race" or national origin. Whren, 517 U.S. at 813.

To bring a successful § 1983 claim for denial of equal protection, a plaintiff must demonstrate both that the officer's conduct "had a discriminatory effect and that it was motivated by a discriminatory purpose." United States v. Armstrong, 517 U.S. 456, 465 (1996). "To establish a discriminatory effect in a race [or national origin] case, the claimant must show that similarly situated individuals of a different race [or national origin] were not" arrested. Id.; see also Fog Cutter Capital Grp. Inc. v. SEC, 474 F.3d 822, 826 (D.C. Cir. 2007) ("[A] claimant must be part of a protected class . . . and show not only that the [officers] acted with bad intent, but also that 'similarly situated individuals [outside the protected category] were not prosecuted.'" (citation omitted)). This can be shown "by naming a similarly situated individual who was not [arrested] or through the use of statistical or other evidence which 'address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'" Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 534 (6th Cir. 2002) (citation omitted).

Richards has failed to make the requisite showing that her arrest had a "discriminatory effect." To substantiate her equal protection claim, Richards must proffer some evidence that "similarly situated" individuals—that is, individuals who allegedly had threatened to do bodily harm—who were of a different race or national origin were not arrested. See Branch Ministries v.

15

Rossotti, 211 F.3d 137, 145 (D.C. Cir. 2000) (finding that the Court need not examine whether there was improper motivation when plaintiff "failed to establish that it was singled out for prosecution from among others who were similarly situated"); United States v. Dixon, 486 F. Supp. 2d 40, 46 (D.D.C. 2007) (finding "defendant would need to demonstrate that other, similarly situated motorists of different races were not stopped by the MPD—and, specifically, by the three MPD officers involved in this case—despite" also displaying only one, partially obscured tag on the rear of their vehicle).

Richards has failed to do so. She has not identified any similarly situated individuals who received disparate treatment. Compare United States v. Eisenberg, 149 F. Supp. 3d 71, 88 (D.D.C. 2015) (finding claim for selective prosecution failed because claimant compared himself to someone who was not similarly situated) with Chavez v. Ill. State Police, 251 F.3d 612, 637 (7th Cir. 2001) (finding discriminatory effect where police officers had trailed two vehicles being driven in the same manner but stopped only the driver who was Hispanic and not the driver who was white). Nor has she proffered circumstantial evidence of discriminatory effect, such as evidence that Gelsomino had a record of misconduct or engaged in a pattern of discrimination. See Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1170–71 (10th Cir. 2003) (vacating summary judgment where, in addition to evidence of the officer's discriminatory conduct during a traffic stop, plaintiff provided evidence of "extensive alleged misconduct" establishing a pattern of discrimination against blacks and Hispanics). And although Richards does proffer expert testimony, it does not include any statistical, empirical, or other evidence that supports Richards' claim that she was disparately treated. [9] See Chavez, 251 F.3d at 640 ("While it is true that

---

[9] Gaut's testimony instead identifies law enforcement policies and states summarily that Gelsomino's actions "are best described as Biased-Based Policing," which is defined as "the application of police authority based on a common trait of a group." Gaut Decl. ¶¶ 40, 43 (emphasis omitted). He concludes that, because "there was no probable cause to believe that Ms. Richards committed a crime[,] . . . Gelsomino's primary basis for arrest appears to have been

16

statistics alone rarely state a violation of equal protection . . . they can be sufficient to establish discriminatory effect.").

The only evidence Richards has submitted is that Gelsomino asked her where she was born and failed to investigate further the domestic dispute or provide a reason for Richards' arrest. Pl.'s Opp'n at 17. Such statements and conduct are insufficient to establish that the law was selectively enforced against Richards. True, some courts have found that direct evidence of discriminatory motive establishes a prima facie case of discrimination. See, e.g., Mazloum v. D.C. Metro. Police Dep't, 522 F. Supp. 2d 24, 43–44 (D.D.C. 2007) (finding use of "racial slurs while assaulting an individual in custody" was sufficient to establish a race discrimination claim under the D.C. Human Rights Act); Giron v. City of Alexander, 693 F. Supp. 2d 904, 924, 938 (E.D. Ark. 2010) (noting direct evidence of discrimination, such as officer's statements that he targeted and arrested Hispanics because they "probably did not have drivers licenses" and it would therefore be "an easy ticket and an easy tow," evidenced both officer's discriminatory purpose and the resulting discriminatory effect). "Direct evidence of discrimination 'is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference.'" Mazloum, 522 F. Supp. 2d at 43 (citation omitted). But Richards has provided no such evidence. Viewing the evidence in the light most favorable to Richards, Gelsomino's conduct at most suggests that Gelsomino harbored prejudice, but does not, on its face, require such a conclusion. As the Court has already concluded, Gelsomino had probable cause to arrest Richards before she ever approached her or learned that Richards was born in Jamaica. The general question "where were you born?" is not on its face discriminatory on the basis of race or national origin—hence it is not

---

. . . Ms. Richards' national origin." Id. ¶ 46. But the Court has already found that Gelsomino had probable cause to arrest Richards, and Gaut provides no further explanation or analysis to support his conclusion. Moreover, he does not address the relevant Fifth Amendment inquiry—whether Richards was treated differently from other similarly situated individuals.

direct evidence of discrimination. Gelsomino did not state that she was arresting Richards because of her race or national origin rather than because Richards had threatened Grady—one would have to infer that from the question Gelsomino asked. And Richards has provided no evidence that Gelsomino would not have arrested her had she been of a different race or national origin.[10]

"The threshold inquiry in evaluating an equal protection claim is . . . 'to determine whether a person is similarly situated to those persons who allegedly received favorable treatment.'" Women Prisoners of D.C. Dep't of Corrections v. District of Columbia, 93 F.3d 910, 924 (D.C. Cir. 1996) (citation omitted). Proof of disparate treatment is an "absolute requirement." Armstrong, 417 U.S. at 467. Here, there is no statistical or other evidence of any disparity. Because Richards has not submitted sufficient evidence to support a requisite element of her claim, no reasonable jury could return a verdict in her favor. See Branch Ministries, 211 F.3d at 144–45; Bradley v. United States, 299 F.3d 197, 206–07 (3d Cir. 2002) (concluding that the court need not determine whether officers acted with a discriminatory purpose where plaintiff failed to demonstrate a discriminatory effect). Summary judgment must therefore be entered as to Count II in favor of Gelsomino. See Fernandez v. DeLeno, 71 F. Supp. 2d 224, 230 (S.D.N.Y. 1999) (granting summary judgment on equal protection claims when plaintiffs failed "to adduce any

---

[10] Richards also relies on OPC's finding that Gelsomino discriminated against Richards in violation of an MPD order. Pl.'s Opp'n at 7–8 (citing OPC Findings at 5–7). In so finding, OPC concluded that, although "there is no evidence that Officer Gelsomino's arrest of the complainant was related in any way to her questions about complainant's national origin, the questions themselves, which had no lawful purpose, created an environment in which complainant felt singled out and challenged solely on the basis of her national origin." OPC Findings at 6. However, although Gelsomino's conduct was sufficient to violate MPD guidelines and regulations, the Constitution imposes a different standard. The "questions themselves," untethered to an unequal application of the law, are not sufficient to establish a Fifth Amendment claim. See Armstrong, 517 U.S. at 465 (stating a constitutional violation exists where a "discriminatory purpose" "motivate[s]" the "discriminatory effect"). And OPC found no connection between Richards' arrest and the question Gelsomino asked. Whether a nexus exists between a discriminatory purpose and an unequal application of the law is ordinarily a question for the jury. Here, however, the latter part of that equation—evidence of an unequal application of the law—is missing, and hence summary judgment is appropriate.

admissible evidence of disparate treatment or point to any similarly situated persons that were treated differently").

## **CONCLUSION**

For the reasons described above, defendant's motion for summary judgment will be granted. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: April 8, 2019